IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLAN ERIC CARLSON, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| STEPHEN CARMICHAEL, et al., | : | NO. 10-3579 |
| Defendants. | : | |

**MEMORANDUM**

**GENE E.K. PRATTER, J.**                                                                                   **JULY 19, 2013**

Plaintiff Allan Carlson alleges that he was arrested and abused by the Defendants. During the course of discovery, the U.S. Attorney's Office, serving as defense counsel, inadvertently disclosed arguably privileged documents to Mr. Carlson's counsel. On April 15, 2013, Mr. Carlson filed a Motion to Resolve a Disputed Claim of Privilege, the upshot of which is the argument that the defense has waived, or otherwise lost, the claim to privilege vis-à-vis the disclosed documents. For the reasons set forth below, the Court will grant Mr. Carlson's motion and permit Plaintiff's continued retention of the documents as produced.[1]

**I.  BACKGROUND**

In his complaint, Mr. Carlson alleges that he was arrested at his home on March 19, 2010 by six of the individual defendants, including members of the Vineland Police Department, the New Jersey State Police, and the U.S. Marshal's Office. These individuals allegedly abused Mr. Carlson during his arrest and refused to provide him with medical care after his arrest. Mr. Carlson's complaint alleges that the Defendants used excessive force in violation of the Fourth and Eighth Amendments, that they conspired to violate his civil rights, that they denied him

---

[1] This ruling is by no means a ruling on the admissibility of the subject material into evidence at trial.

medical treatment in violation of the Eighth Amendment, and that they committed assault and battery under New Jersey law.  Mr. Carlson seeks compensatory damages, punitive damages, and attorneys' fees.

On November 13, 2012 Mr. Carlson served requests for production on the Defendants.  In February 2013, the Defendants made their initial production of over 500 pages of documents in response to Mr. Carlson's discovery request.  Eight of these pages were specifically identified in the transmittal letter accompanying the documents being produced as "handwritten notes . . . provided by [Defendant] Stephen Carmichael."  The eight pages of notes were not marked as privileged or confidential, did not reveal an attributed author, and did not reflect that they had been drafted by (or for) an attorney.

On February 13, 2013, Mr. Carlson's counsel contacted the U.S. Attorney's Office because some of the eight pages of notes were illegible.  The same day, AUSA David Degnan discovered that the eight pages were actually notes taken by Nicole Mark, a former AUSA, during an interview she had conducted during the time period while she was an attorney in the U.S. Attorney's Office and assigned the defense of this case and, therefore, representing Officer Carmichael.  Mr. Degnan has stated that he inadvertently previously produced the notes because, when, upon Ms. Mark's job change, the case was transitioned to him, the notes had ended up in an electronic folder entitled "Documents from Carmichael," and he thus assumed they were Defendant Officer Carmichael's own notes and produced them.  Upon Mr. Degnan's realization of the mistake, this dispute ensued.

## II.  DISCUSSION

Under Federal Rule of Evidence 502(b), a disclosure of a communication "covered by the attorney-client privilege or work-product protection" does not constitute a waiver if (i) "the

disclosure is inadvertent;" (ii) "the holder of the privilege or protection took reasonable steps to prevent disclosure;" and (iii) "the holder promptly took reasonable steps to rectify the error."  A party who claims that waiver has occurred "has the burden of proof as to waiver."  *See Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 216, 223 (E.D. Pa. 2008).  Here, the first and third requirements of Rule 502(b) are not at issue, because Mr. Carlson neither disputes that AUSA Degnan made an inadvertent disclosure nor contends that Mr. Degnan failed to immediately seek the return of the notes upon realizing who wrote them.[2]  However, Mr. Carlson does argue that the U.S. Attorney's Office failed to take reasonable steps to prevent the disclosure of the notes in the first instance.

As they did before the promulgation of Rule 502(b), courts consider a wide range of factors in determining whether waiver has occurred under the Rule, including "the reasonableness of the precautions taken" by the party who inadvertently disclosed a communication, as well as "the number of documents to be reviewed and the time constraints for production."  *See* Fed. R. Evid. 502 advisory committee's note; *see also Rhoads*, 254 F.R.D. at 219 (E.D. Pa. 2008) (noting that even before Rule 502 was enacted in 2008, courts considered "[t]he reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production") (citations and quotations omitted).  The question now before the Court is whether Mr. Carlson has shown that the U.S. Attorney's Office failed to take reasonable steps to prevent the disclosure of the notes in light of the number of documents it had to review, the time it had to review them, and other similar, commonsense factors.  In addressing this issue, the Court notes that the documents in dispute included no indication on their face that they were

---

[2] The focal point of the parties' briefing has been whether the Defendants waived the attorney-client and work product privileges, rather than whether the underlying documents were privileged in the first instance.  Given its decision that the privileges were waived, the Court will proceed without deciding whether the documents were initially entitled to be withheld from discovery as privileged or protected as attorney work product.

privileged, confidential, or drafted by an attorney.  Moreover, the Defendants produced fewer than 600 pages of documents in February 2013, and this production was based on a discovery request submitted three months earlier.

Mr. Carlson points to case law with fact patterns that suggest that the U.S. Attorney's Office failed to take reasonable steps to prevent the disclosure of privileged material in this case. For example, in *Atronic International, GmbH v. SAI Semispecialists of America, Inc.*, 232 F.R.D. 160 (E.D.N.Y. 2005), the court found that a litigant failed to take reasonable steps to prevent the disclosure of privileged emails because its "counsel failed to label the documents 'confidential' or 'privileged'" and because there was "no evidence in the record that [its] counsel adequately employed a reasonable procedure for separating confidential materials from non-privileged communications."  *See id.* at 164; *see also id.* (collecting cases in which courts found precautions inadequate because litigants failed to label privileged documents as "confidential").

Here, Ms. Mark (the government attorney with initial responsibility for this case) failed to label her notes as "confidential" or to identify herself as their author.  *See* Transcript of Oral Argument at 37 (Q by the Court: "Can you tell me anything that you believe or understand or have learned that Ms. Mark did to guard against disclosure of her notes?"  A: "No.").  Moreover, the Defendants acknowledge that "[i]t is not known how the notes ended up in [the] folder" entitled "Documents from Carmichael," *see* Docket No. 52 at 7, and Defendants appear to have no information as to whether or how anyone at the U.S. Attorney's Office sequestered privileged documents from non-privileged ones.  Finally, other relevant factors disfavor finding that the U.S. Attorney's Office took reasonable precautions here.  In particular, the Defendants produced fewer than 600 pages of documents in February 2013, and counsel had three months to review these documents before producing them.

In their briefing, the Defendants attempt to argue that they have not waived the attorney-client privilege. The Defendants first contend that "the inadvertent disclosure did not stem from a lack of preventive mechanisms, but from the unusual facts of this case," to wit, because Ms. Mark left the U.S. Attorney's Office and the file was transferred to another attorney for handling. *See* Docket No. 52 at 7. Even if Ms. Mark's departure had been flummoxing for some reason, the Court must start with the observation that in the legal profession today, in both the public and private sectors, lawyers' departures from their firms and jobs are commonplace. Having to deal with matters in the wake of lawyers' moves is hardly unusual, shocking or confusing. Presumably, Mr. Degnan never would have produced the notes if any steps had been taken to guard against their disclosure, such as marking them as privileged, identifying the author, ensuring that they were removed from the folder entitled "Documents from Carmichael," or in some other way alerting for the need to exercise caution. The Defendants state that Mr. Degnan "had no reason to think that the notes were not, in fact, from Probation Officer Carmichael," *see id.*, but without being critical of Mr. Degnan, who was in an unenviable (but not unique) situation, the Court must conclude that Mr. Degnan lacked such a reason *because of* (at least primarily because of) the actions or inactions of others in his office.

Second, the Defendants claim that they acted reasonably in guarding against an inadvertent disclosure because Mr. Degnan personally reviewed every document before producing them to Mr. Carlson's counsel. Here, however, such a review could not constitute a "reasonable step" that would prevent waiver under Rule 502(b). Although the Court does not doubt that Mr. Degnan reviewed the contested documents, his review was rendered ineffective before it even began because of the actions of others in his office, actions which left him without any reasonable chance of discovering that the notes were privileged. While it is true that Mr.

Degnan could have chosen to try to ascertain the provenance of every document in the case file when he took the case over, he did not do so.  Even though a newly assigned counsel may not have personally dropped the proverbial ball, the arrival of replacement counsel cannot afford a party a "Mulligan"[3] or the unfettered benefit of a reset button (for those who prefer an electronics metaphor) with respect to analyzing whether the party, as opposed to a specific lawyer, may claim the privileges' protections.  To hold otherwise would, bizarrely, reward the turnstile staffing of litigation matters that can hardly be something to be encouraged for the fair and expeditious handling of cases.  Therefore, upon careful consideration of the wide range of factors that are relevant in a Rule 502(b) analysis, the Court holds that the attorney-client and work-product privileges have been waived in this case because of the absence of any demonstrated effort to maintain them.

### III.  CONCLUSION

For the foregoing reasons, the Court grants Mr. Carlson's Motion to Resolve a Disputed Claim of Privilege.  An appropriate Order follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[3] According to the United States Golf Association, the term "mulligan" likely originates in or about the 1920s from hotelier David Mulligan's tendency to play additional teeshots at the St. Lambert Country Club in Montreal, Quebec, Canada.  See Golf History FAQ, USGA Museum, http://www.usgamuseum.com/researchers/faq/#q9 (last visited July 17, 2013).